IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT P. LARGESS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | |
| SUPREME JUDICIAL COURT FOR THE | ) | |
| STATE OF MASSACHUSETTS; | ) | |
| CHIEF JUSTICE MARGARET MARSHALL, | ) | **04 - 10921 JLT** |
| JUSTICE ROBERT J. CORDY, JUSTICE | ) | |
| JUDITH A. COWIN, JUSTICE JOHN M. | ) | |
| GREANEY, JUSTICE RODERICK L. IRELAND, | ) | |
| JUSTICE MARTHA B. SOSMAN, JUSTICE | ) | |
| FRANCIS X. SPINA, in their official capacities | ) | |
| as Justices of the Supreme Judicial Court of | ) | |
| Massachusetts; MASSACHUSETTS | ) | |
| DEPARTMENT OF PUBLIC HEALTH; | ) | |
| CHRISTINE C. FERGUSON, in her official | ) | |
| capacity as Commissioner of the Massachusetts | ) | |
| Department of Public Health; JUDY A. | ) | |
| McCARTHY, in her official capacity as City | ) | |
| Registrar for the City of Boston; CITY AND | ) | |
| TOWN CLERKS 1-350, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

STATEMENT OF FACTS AND INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD FOR INJUNCTIVE RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   PLAINTIFF HAS A LIKELIHOOD OF SUCCESS ON
     THE MERITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A.   Federal Constitutional Guarantee of a Republican Form of Government . . . . . . . . . . . . 2

B.   The Division of Powers in the Massachusetts Constitution . . . . . . . . . . . . . . . . . . . . . . . 7

     1.   The Goodridge court performed a purely legislative function when
          it redefined marriage to include same-sex marriage . . . . . . . . . . . . . . . . . . . . . . . 9

     2.   The State Constitution grants the Legislature the exclusive authority
          over transferring subject matter jurisdiction in all cases involving
          marriage, divorce and alimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.  PLAINTIFF, LIKE ALL CITIZENS OF THE COMMONWEALTH, FACES
     IRREPARABLE HARM IF THE TRO AND PRELIMINARY
     INJUNCTION DOES NOT ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III. BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF GRANTING
     THE TRO AND PRELIMINARY INJUNCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

COMES NOW the Plaintiff, by and through his undersigned counsel, pursuant to Fed. R. Civ. P. 65, and files this Memorandum of Law in support of his Motion for Temporary Restraining Order and a Preliminary Injunction, and in support thereof, states as follows:

## STATEMENT OF FACTS AND INTRODUCTION

The facts are as stated in the Complaint for Preliminary and Permanent Injunctive Relief, and Declaratory Relief. Plaintiff relies upon those facts as if fully set forth herein.

Pursuant to the guarantee of a republican form of government (the "Republican Guarantee Clause") contained in the United States Constitution at Article IV, Section IV, plaintiff Robert P. Largess, a citizen of the Commonwealth, respectfully moves this Court to temporarily restrain, and preliminarily enjoin, enforcement of the decision of the Supreme Judicial Court in *Goodridge v. Dept. of Public Health*, 440 Mass. 309 (2003) insofar as the court in hearing the case and, separately, in redefining "marriage", performed a function not granted to it by the people in the Massachusetts Constitution.

It bears emphasis that resolution of this case does *not* require this Court to determine the wisdom of the decision by the *Goodridge* court that denying marriage licenses to same-sex couples violated the state constitutional rights of those individuals. Nor does it ask this Court to vacate the Massachusetts decision. Rather, plaintiff asks this Court to enjoin enforcement of the *Goodridge* decision on the grounds that the court violated the separation of powers set forth in the state constitution, thereby depriving plaintiff and all citizens of the Commonwealth, of the federal constitutional guarantee of a republic form of government.

## STANDARD FOR INJUNCTIVE RELIEF

The standards for issuance of a temporary restraining order and a preliminary injunction are the same. They require: "consideration of movant's likelihood of success on the merits, potential for irreparable harm, balancing of relevant equities, and effect on public interest." *Campbell Soup Co.*

1

*v. Giles*, 47 F.3d 467 (1st Cir. 1995). The First Circuit has stated, "Over time, we have crafted a four-part framework for use in determining whether the grant or denial of preliminary injunctive relief is appropriate. Under this formulation, trial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996).

## I.    PLAINTIFF HAS A LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiff can demonstrate a likelihood of success on the merits of his claim that the *Goodridge* court violated the separation of powers established in the Massachusetts constitution on two independent grounds. The court violated the separation of powers (i) in hearing the matter, and (ii) separately, in expressly redefining marriage. When one branch usurps the powers of another, co-equal branch, it constitutes a violation of the federal constitutional guarantee of a republican form of government. That guarantee inures to the individual citizens, of which plaintiff is one.

### A.    Federal Constitutional Guarantee of a Republican Form of Government

Article IV, section 4 of the U.S. Constitution provides that the "United States shall guarantee to every State in the Union a Republican Form of Government." Although claims premised on the Republican Guarantee Clause have long been viewed as nonjusticiable political questions in most circumstances, *see Luther v. Borden*, 48 U.S. (7 How.) 1, 46-47 (1849), Justice O'Connor noted in *New York v. United States* "that perhaps not all claims under the Guarantee Clause present nonjusticiable political questions." 505 U.S. 144, 183 (1992). "Contemporary commentators," she noted, "have likewise suggested that courts should address the merits of such claims, at least in some circumstances. *Id.* at 185 (citing L. Tribe, American Constitutional Law 398 (2d ed. 1988); J. Ely, Democracy and Distrust: A Theory of Judicial Review 118 and n. 122-123 (1980); W. Wiecek,

2

The Guarantee Clause of the U.S. Constitution 287-289, 300 (1972); D. Merritt, 88 Colum. L. Rev.
1, 70-78 (Jan. 1988); Bonfield, The Guarantee Clause of Article IV, Section 4: A Study in
Constitutional Desuetude, 46 Minn. L. Rev. 513, 560-65 (1962).

  In the wake of the Supreme Court's decision in *New York*, it is clear that there are
circumstances in which the Republican Guarantee Clause can, and should, be a basis for reigning in
one branch of government. In fact, a case arising out of Nevada has as its central claim that the
Nevada Supreme Court and the majority of the Nevada Legislature violated the separation of
powers, thereby constituting a violation of the Republic Guarantee Clause. *See* Briefs on appeal of
Angle v. Nevada, 274 F. Supp.2d 1152 (D. Nev. 2003), available at www.claremont.org (initial brief)
and 2003 WL 23303077 (answering), and 2004 WL 541552 (reply). Because of the similarity of the
cases, we discuss the facts in detail.

  That case involved a voter approved amendment to the Nevada Constitution, which
prohibited the Legislature from imposing new or increased taxes without the concurrence of 2/3 of
the Members of each house of the Legislature. Those tax measures that do not receive the necessary
2/3 vote can still be adopted, but must be submitted to the voters for approval before they can take
effect. Nev. Const., Art. 4, section 18(2) – (3). At the outset of the 2003 legislative session, the
Nevada Governor proposed to the Legislature a budget which included a $980 million tax increase.
Unable to garner the 2/3 vote required to approve the Governor's requested tax hike, the Legislature
adjourned its session on June 3, 2003, having appropriations totaling more than $3.2 billion, but
without a dime for education, arguably the only spending item actually mandated by the Nevada
Constitution. The Governor immediately called the Legislature into special session to consider a tax
increase and a couple of education funding bills.

  Because the Nevada Constitution mandates a balanced budget, and because the previously-
approved spending bills had left only $700 million to cover a proposed education budget of $1.6

billion, any appropriation for education approved during the special session by the Legislature that was anywhere near the amounts proposed was going to require a tax increase of somewhere between $800 and $900 million. The Nevada Assembly was unable to muster a 2/3 vote for any of the tax increases. Minutes after midnight on July 1, 2003, the first day of the new fiscal year, the Governor brought suit against the Nevada Legislature and every one of its Members. He sought from the Nevada Supreme Court a writ of mandamus, seeking to compel the Legislature to take legislative action on his tax increase and thereby balance the budget and fund education. A group of legislators filed a counter-petition, seeking an order directing the Governor to expand the special session so that the Legislature could make further attempts to pass the necessary budget. The Nevada Supreme Court, however, issued an Opinion and Writ of Mandamus directing the Nevada Legislature to consider tax-increase legislation by "simple majority rule" rather than the 2/3 vote required by Article 4, section 18(2). In other words, the court directed the Legislature to pass the budget by a margin that violated the constitutional amendment passed by the people. Three days later, the Legislature passed the budget by a simple majority.

The next morning, legislators, individual citizens, trade groups and tax policy organizations filed suit in the United States District Court for the District of Nevada, contending, among other things, that the court order and subsequent legislative action ignored the structural commands of the state Constitution in violation of the Republican Guarantee Clause. The District Court dismissed the case. That case was appealed to the Ninth Circuit Court of Appeals, and was argued within the past few weeks. Separately, legislators and citizens have filed a petition with the United States Supreme Court, on appeal from the Nevada Supreme Court decision, where the first question presented is:

> Whether the effective nullification of a key, recently-enacted structural provision of the Nevada State Constitution violates the Republican Guarantee Clause of Article IV of the United States Constitution?

4

The petition for certiorari, which is still awaiting decision, points out that the Supreme Court has plainly indicated that certain Republican Guarantee Clause cases are justiciable.[1]

This case, like the Nevada case, presents one of the instances in which a Republican Guarantee Clause claim must be viable. The essence of the republican guarantee is the right of a State's citizens to "structure their government as they see fit." *Kelley v. United States*, 69 F.3d 1503, 1511 (10th Cir. 1995). *See also New York*, 505 U.S. at 181 ("The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'"). In *Gregory v. Ashcroft*, the Supreme Court explained the history and purpose of the separation of powers.

> Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front. Alexander Hamilton explained to the people of New York, perhaps optimistically, that the new federalist system would suppress completely "the attempts of the government to establish a tyranny. . . . In a confederacy the people, without exaggeration, may be said to be entirely the masters of their own fate. Power being almost always the rival of power, the general government will at all times stand ready to check the usurpations of the state governments, and these will have the same disposition towards the general government. The people, by throwing themselves into either scale, will infallibly make it preponderate. *If their rights are invaded by either, they can make use of the other as the instrument of redress.*"

501 U.S. 452, 459 (1991) (quoting The Federalist No. 28, pp. 180-181 (C. Rossiter ed. 1961)) (emphasis added).

The *Gregory* Court further discussed the issue by quoting James Madison

---

[1] Counsel on the Petition for Writ of Certiorari include Edwin Meese III and Professor John C. Eastman of The Claremont Institute Center for Constitutional Jurisprudence at Chapman University.

"In a single republic, all the power surrendered by the people is submitted to the administration of a single government; and the usurpations are guarded against by a division of the government into distinct and separate departments. In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among district and separate departments. *Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself.*"

*Id.* (quoting The Federalist No. 51, p.323) (emphasis added).    In *New York*, the Supreme Court

dismissed the Republican Guarantee Clause claim only because the statute in that case did not "pose

any realistic risk of altering the form or the method of functioning of New York's government." 505

U.S. at 186. That Court, however, went on to explain:

Some truths are so basic that, like the air around us, they are easily overlooked. Much of the Constitution is concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form. The result may appear "*formalistic*" in a given case to partisans of the measure at issue, because such measures are typically the product of the era's perceived necessity. But the Constitution protects us from our own best intentions: *It divides power among sovereigns and among braches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.*

505 U.S. at 187.

The Goodridge court altered the allocation of power expressly provided for in the Massachusetts constitution between the judiciary and Legislature. *See, e.g., Brzonkala v. Virginia Polytechnic Institute and State Univ.*, 169 F.3d 820, 895 (4th Cir. 1999) (noting that the federal courts are supposed to protect the structural preferences of a State's citizens, serving as a sort of "structural referee"), *aff'd sub nom United States v. Morrison*, 529 U.S. 598 (2000). A review of the powers granted in the Massachusetts Constitution reveals that the *Goodridge* court violated the express separation of powers in at least two ways: it lacked subject matter jurisdiction to even hear the case, and, *wholly separate*, it was without power to perform the legislative function of redefining marriage. There can be no question that the court's cavalier attitude toward adhering to

6

the express separation of powers as provided by the people of the Commonwealth in their constitution, is the antithesis of a guarantee of a republican form of government.

## B.     The Division of Powers in the Massachusetts Constitution.

The Massachusetts Constitution establishes three co-equal and independent branches of government. The legislative power is reposed in the General Court, *Mass. Const.* Part 2, ch. I, § I, arts. I, IV; the supreme executive power is reposed in the Governor, *Mass. Const.* Part 2, ch. II, § 1; and the judicial power is reposed in the judiciary, *Mass. Const.* Part. 2, ch. III.   Under the Massachusetts Constitution, no branch of government shall exercise the powers of either of the other two branches. *Mass. Const.* Part 1, art. XXX.   This separation of powers is essential for preserving the rule of law and preventing tyranny—whether from the executive, legislative, or judicial branch. *See* THE FEDERALIST NO. 47 (James Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.").

The state constitution seeks to ensure this separation of powers in providing that the "judicial shall never exercise the legislative and executive powers." *Mass. Const.* Part 1, art. XXX. Under this principle, each branch of government performs its constitutionally-established functions within its own limited jurisdiction. Part I, Art. XVIII of the constitution provides that "The people . . . have a right to require of their lawgivers and magistrates, an exact and constant observance of them, in the formation and execution of the laws necessary for the good administration of the Commonwealth." As the Supreme Judicial Court has acknowledged, this limitation also applies to the courts. *See Opinion of the Justices to the Senate*, 383 Mass. 895, 916 (1981) ("[B]oundaries set by the Constitution on our duty to furnish opinions are jurisdictional in nature and 'must be strictly observed in order to preserve the fundamental principle of the separation of the judicial from the

7

executive and the legislative branches of government.'") (quoting *Answer of the Justices to the Council*, 362 Mass. 914, 917 (1973)).

Moreover, the Supreme Judicial Court has made clear that no branch of government (and most especially the Legislature) may abandon or transfer any of the powers entrusted to it by the Constitution to any other person or group of persons. *See Opinion of the Justices to the House of Representatives*, 328 Mass. 674, 675 (Mass. 1952) ("Article 30 of the Declaration of Rights provides for the permanent separation of the executive, legislative, and judicial powers in the government of the Commonwealth, and the Constitution, by the various provisions of c. 1, § 1, particularly those contained in art. 4, designates the General Court as the repository of the legislative power. *It is fundamental that no one of the three great departments of government can abandon any of the powers entrusted to it by the Constitution or transfer those powers to any other person or group of persons. If this could be done the plan of government laid down by the Constitution could be destroyed.*") (emphasis added). *See also Town of Brookline v. The Governor*, 407 Mass. 377, 384 n.10 (1990) ("We would be reluctant to tolerate a situation in which allegedly unconstitutional conduct would be free from judicial scrutiny even on the request of an entity most directly affected by the alleged unlawful conduct."); *cf. LaGrant v. Boston Housing Authority*, 403 Mass. 328, 330 (1988) (concluding that a branch of government has standing in a "claim that [another branch] has violated art. 30 by encroaching on [its] power" for if it "cannot seek judicial relief, then the . . . branch might be foreclosed from protecting its separate powers").

As discussed below (I.B.2.), simply by hearing the case, the judiciary usurped the legislative power over all "causes" of marriage. It bears emphasis that, separate and apart from that first argument, the judiciary usurped the legislative power when it redefined marriage as its solution for what it found to be discriminatory marriage laws. Thus, without even delving into the intricacies of the separation of powers concerning who can hear "causes" of marriage, this Court can enjoin

enforcement of the decision because the *Goodridge* court exceeded its powers in redefining marriage, thereby violating the Republic Guarantee Clause.

### 1. The Goodridge court performed a purely legislative function when it redefined marriage to include same-sex marriage.

The treatment afforded the Goodridge Court of the separation of powers argument stands in stark contrast to the Republican Guarantee Clause. One fact quite telling of the court's disregard for the fundamental importance of the separation of powers is the fact that the argument was specifically put forth before the court, yet it failed to treat it as a serious restraint on its powers. In particular, the court simply states that "[t]o label the court's role as usurping that of the Legislature is to misunderstand the nature and purpose of judicial review." It offered no explanation of where it obtained the power to fashion a new law and decree its implementation within 180 days.

Assuming *arguendo* that the court had subject matter jurisdiction to even consider the constitutionality of the State's refusal to issue marriage licenses to same sex couples, it did not have the power to redefine the marriage laws. Yet, that is precisely what the court did. The court explains that the "everyday meaning of 'marriage' is 'the legal union of a man and woman as husband and wife,' . . . and the plaintiffs do not argue that the term 'marriage' has ever had a different meaning under the Massachusetts law.'" The court also explained that the Massachusetts statutes "confirms" the Legislature's intent to adopt and adhere to that definition of marriage. Indeed, the court concluded that the licensing statute could *not* be "construed to permit same-sex couples to marry." After concluding that denying marriage to same-sex couples violates their constitutional rights under the Massachusetts constitution, the court turned to fashioning a remedy. Surprisingly, it turned to the laws of a foreign country for guidance. It referred to the actions of the Court of Appeal for Ontario, which not only declared the marriage laws unconstitutional, but then "refined the common-law meaning of marriage" to permit same-sex marriage. Thus, it is no surprise that the *Goodridge* court held: "We construe civil marriage to mean the voluntary union of two

9

persons as spouses, to the exclusion of all others. This reformulation redresses the plaintiffs'

constitutional injury . . . ." What the court should have done is turn to U.S. precedence for guidance,

including the decision of the Supreme Court in Vermont. The Supreme Court of Vermont, in *Baker*

*v. State*, faced the exact same question of how to fashion a remedy after it declared that refusal to

grant marital benefits to same-sex couples was a violation of plaintiffs' state constitutional rights.

There, the court stated:

> We hold only that plaintiffs are entitled under Chapter I, Article 7, of the Vermont
> Constitution to obtain the same benefits and protections afforded by Vermont law to
> married opposite-sex couples. *We do not purport to infringe upon the prerogatives of*
> *the Legislature to craft an appropriate means of addressing this constitutional*
> *mandate*, other than to note that the record here refers to a number of potentially
> constitutional statutory schemes from other jurisdictions.
> * * *
> [I]t cannot be doubted that judicial authority is not ultimate authority. It is certainly
> not the only repository of wisdom. When a democracy is in moral flux, courts may
> not have the best or the final answers. Judicial answers may be wrong. They may be
> counterproductive even if they are right. Courts do best by proceeding in a way that
> is catalytic rather than preclusive, and that is closely attuned to the fact that courts
> are participants in the system of democratic deliberation.

744 A.2d 864, 886-88 (Vt. 1999) (emphasis added).[2]

Similarly, in *Colegrove v. Green*, the United States Supreme Court considered the

constitutionality of how Illinois districts were drawn. 328 U.S. 549 (1946). The Court pointed out

that "[o]f course no court can affirmatively remap the Illinois districts so as to bring them more in

conformity with the standards of fairness for a representative system. At best we could only declare

the existing system invalid." *Id.* at 553[3] In other words, the Supreme Court realized it had the power

to determine the validity of the laws, but did not have the power to perform the legislative function

of redistricting the state.

---

[2] Even in the landmark decision by the Supreme Court in *Brown v. Board of Education*, 347 U.S.
483 (1954), the Court did *not* fashion a remedy for desegregating schools. *See Brown v. Board of*
*Education*, 349 U.S. 294 (1955).

[3] The Court's decision in *Colegrove* that the matter was nonjusticiable predates its decision in *New*
*York v. United States*.

In yet another case, the Kansas Supreme Court had before it the question of whether the statute violated the state constitutional separation of powers. Although not decided under the Republican Guarantee Clause, the court's discussion is instructive. The court explained that "[w]hen a statute is challenged under the constitutional doctrine of separation of powers, the court must search for a usurpation by one department of the powers of another department on the specific facts and circumstances presented. . . . It seems to us that to have a usurpation of powers there must be a significant interference by one department with the operations of another department." *Parcell v. State*, 620 P.2d 834, 836 (Kan. 1980). It explained that there were a number of factors a court could consider in determining whether there has been usurpation of powers by another branch. Two of those factors are relevant to the facts at hand. The first asks what is the essential nature of the power being exercised – i.e., is the power exclusively within the authority of one branch, or is it a power granted to two branches. The second factor is the degree of control by the one branch over the other – i.e., is the one branch exercising a coercive influence or mere cooperative venture. *Id.*

Here, the *Goodridge* court declared that the current marriage laws violated the plaintiffs' state constitutional rights, and then performed a wholly legislative function in redefining marriage as the remedy for the violations. The essential nature of that portion of the decision is legislative. The *Goodridge* decision also was coercive – it ordered that its redefinition of marriage become effective after 180 days. Plainly, the Goodridge court exceeded its powers and violated the Republican Guaranty Clause.

## 2. The State Constitution grants the Legislature the exclusive authority over transferring subject matter jurisdiction in all cases involving marriage, divorce and alimony.

A separate basis to enjoin the decision is that the court lacked subject matter jurisdiction to even hear the case. The Legislature has the exclusive authority over transferring subject matter jurisdiction in all cases involving marriage, divorce and alimony:

11

All causes of marriage, divorce, and alimony, and all appeals from the Judges of probate shall be heard and determined by the Governor and Council, until the Legislature shall, by law, make other provision.

*Mass. Const.* Part 2, ch. III, art. V. Thus, the Constitution of the Commonwealth explicitly gives the *political* branches, not the *judicial* branch, authority over jurisdiction in marriage cases. Unless the Legislature makes an express transfer of jurisdiction concerning marriage, jurisdiction to determine all causes of marriage, divorce, and alimony resides with the Governor and Council under art. V.

The Legislature has transferred *some* elements of jurisdiction under this constitutional provision to the courts, but that jurisdiction is limited and certainly does not encompass the definitional issue raised in *Goodridge*. Under the Massachusetts Constitution, the exclusive original subject matter jurisdiction for deciding cases involving marriage was placed in the Governor and Council, until the Legislature made other provision. *Mass. Const.* Part 2, ch. III, art. V. *See also Mass. Const.* Part 2, ch. II, § 1, art. IV, and ch. II, § III, art. 1 (creating Council and establishing its powers). The Legislature, however, has "made other provision" only in cases involving divorce, alimony, affirmation, and annulment. The Legislature has *not* enacted any similar provision to transfer jurisdiction in any other case of marriage such as the definitional issue in *Goodridge*.

The Legislature has enacted only two provisions transferring jurisdiction under article V: one statute relating to divorce and alimony; and one statute relating to affirmation and annulment. First, in 1785 the Legislature passed "An Act for regulating Marriage and Divorce," which extended jurisdiction to the courts on matters of divorce and alimony. The second to last provision of that act provides "Be it therefore enacted by the authority aforesaid, that all questions of divorce and alimony shall be heard and tried by the Supreme Judicial Court holden for the county where the parties live, and that the decree of the same Court shall be final." 1785 Mass. Acts 69. Second, in 1836 the Legislature extended the court's jurisdiction to questions of affirmation or annulment of

12

marriage.[4] The Revised Statutes of 1836 contain, in the statute pertaining to divorce, a provision providing that if the validity of a marriage was doubted, a libel for annulment was to be filed as for divorce. Mass. Rev. Stat. 76, §§ 3-4 (1836). The Supreme Judicial Court's jurisdiction, therefore, encompassed all cases of divorce and alimony and all cases of affirmation or annulment of marriage.

Since that time, however, there has been no expansion of the subject matter jurisdiction of the court. The subject matter jurisdiction of the court in cases of marriage and divorce remains the same as it was in 1836. Statutes have been passed which transfer jurisdiction within the court system itself, but no statute has been passed which provides for any further jurisdiction by the court. Specifically, there has been no statute or provision by the Legislature granting jurisdiction to the court to hear a case which concerns the definition of marriage in the Commonwealth. Neither has there been any general grant of jurisdiction concerning all causes of marriage to any court. Without such a provision, the *Goodridge* case should have been heard by the Governor and Council in accordance with the requirements of the Constitution.

The Supreme Judicial Court has consistently recognized this constitutional restriction on its jurisdiction in cases of marriage and divorce. It has always emphasized that an express transfer of jurisdiction by the Legislature is necessary before it has authority to hear such cases. *See Loring v. Young*, 239 Mass. 349, 366 (1921) (noting that Massachusetts courts do not have general jurisdiction to decide cases relating to marriage without specific grant of jurisdiction from the Legislature); *Kelley v. Kelley*, 161 Mass. 111, 111 (1894) ("In this Commonwealth, no power exists in any court to pass an order for the payment of alimony *pendente lite*, or of permanent alimony, in

---

[4] Affirmation is the opposite of annulment—a legal declaration that the marriage in question is valid. See MASS. GEN. LAWS ch. 207 § 14 ("If the validity of a marriage is doubted, either party may institute an action for annulling such marriage, or if it is denied or doubted by either party, the other party may institute an action for affirming the marriage.").

13

a matrimonial cause of any description, except under provisions of statute conferring such power.");
*White v. White*, 105 Mass. 325, 327 (1870) (asserting jurisdiction over a case involving divorce and
affirmation of marriage only after recognizing the constitutional provision and the necessary
statutory transfer of jurisdiction by the Legislature); *see also Bernatavicius v. Bernatavicius*, 259
Mass. 486, 488 (1927); *Adams v. Holt*, 214 Mass. 77, 78 (1913); *Robbins v. Robbins*, 140 Mass.
528, 529-30 (1886). [5] During the last rearrangement of the Massachusetts Constitution, the
delegates were explicit in continuing to include Part 2, ch. III, art. V, for "*the words constituted an
operative article, still in force, which should remain in the Constitution.*" *Loring*, 239 Mass. at 366
(citing Volume 4 of Debates, pp. 74 to 80) (emphasis added).

Thus, the Massachusetts Constitution and the decisions of the Supreme Judicial Court are
clear: a specific grant of jurisdiction from the Legislature is necessary in order for any court to hear
"causes" involving marriage, divorce, or alimony. The Supreme Judicial Court has interpreted the
word "causes" in the marriage provision as being equivalent to "'controversies" or "cases."'
*Sparhawk v. Sparhawk*, 116 Mass 315, 317 (1874). Therefore, any court must have a specific grant
of jurisdiction from the Legislature before it can hear any cases or controversies concerning
marriage. *Goodridge* is clearly a controversy concerning marriage. It does not, however, fall under

---

[5] As the court recently noted, this constitutional principle, establishing civil marriage as the special
domain of the political branches, carried over from colonial times. *See Gottsegen v. Gottsegen*, 397
Mass. 617, 621 (1986) (noting that the colonial Legislature "vested jurisdiction over all questions of
marriage and divorce in the Governor and Council"). Moreover, this constitutional principle of
giving original exclusive subject matter jurisdiction to the Governor and Council and the power to
delegate that jurisdiction to the Legislature is not an obsolete tradition, but is strongly supported by
the unique competence of the democratic branches to deal with complicated questions of marriage
and family law. This Court recently acknowledged the Legislature's special competence over
marriage law: "Adjustments in the legislation [concerning marriage and family] to reflect these new
social and economic realities *must come from the Legislature.*" *Connors v. City of Boston*, 430
Mass. 31, 42-43 (1999) (emphasis added). Accordingly, this constitutional principle is buttressed
by Article XXX of the Massachusetts Declaration of Rights, which provides that "the judicial
[department] shall never exercise the legislative and executive powers, . . . to the end that it may be
a government of laws and not of men." *Mass. Const.* Part 1, art. XXX.

14

any of the categories of controversies over which the courts have jurisdiction. *Goodridge* is neither a controversy concerning divorce and alimony, nor a controversy concerning affirmation or annulment of marriage. *Goodridge* presented a question entirely separate from those over which the court has jurisdiction. *Goodridge* called for a redefinition of marriage. *See* 440 Mass. at 337 ("Certainly our decision today marks a significant change in the definition of marriage as it has been inherited from the common law, and understood by many societies for centuries."). Such a case does not fall within the current jurisdiction of the Supreme Judicial Court. In the absence of legislation conferring jurisdiction upon the courts to hear such controversies, the case, or any future similar case challenging the definition of marriage, must be brought before the Governor and Council acting as a court under a constitutional grant of authority.[6]

Under Part 2, ch. III, art. V, the Governor and Council have exclusive authority over matters pertaining to marriage, "until the Legislature shall, by law, make other provisions." As the case law set forth above demonstrates, this Supreme Judicial Court has long recognized that the courts have *no* jurisdiction over marriage matters except and only to the extent that the Legislature expressly confers such jurisdiction. But the only jurisdiction the Legislature has conferred upon the courts (in reference to marriage) relates to divorce, alimony, annulment and affirmation. It is remarkable, therefore, that the majority opinion in *Goodridge* makes no reference to subject matter jurisdiction.[7]

---

[6] This constitutional arrangement does not leave the plaintiffs without redress. Plaintiffs have four legitimate courses of action. First, they could petition the Legislature to pass a statute transferring jurisdiction over matters concerning the definition of marriage to the courts. Second, plaintiffs could petition the Legislature for a change in the substantive law. Third, they could bring their case before the proper tribunal, which in this case would be the Governor and Council. Fourth, plaintiffs could bring a claim in federal court under the United States Constitution. However, the plaintiffs are not allowed to bring a claim that alleges violations of the Massachusetts Constitution, while at the same time asking the court to violate that same Constitution by exercising unauthorized jurisdiction over the subject matter of this case.

[7] In his dissent, Justice Spina criticized the majority opinion for not recognizing the separation of powers principle embodied in Part 1, art. XXX. See 440 Mass. at 350-51 ("what is at stake in this

15

It simply assumed such jurisdiction without examination. A unilateral judicial implementation of the judgment in *Goodridge* without fully addressing the jurisdiction issue presented and the court's limited power under Part 2, ch. III, art. V, would be a constitutional affront to the Legislature, the Governor and the People of the Commonwealth.

The Supreme Judicial Court plainly exceeded the powers granted to it under the Massachusetts Constitution – whether by exercising jurisdiction over the case, or by redefining marriage. The court's actions constitute a violation of the federal constitutional guarantee of a republican form of government. As such, plaintiff has demonstrated a likelihood of success on the merits.

## II.   PLAINTIFF, AND ALL CITIZENS OF THE COMMONWEALTH, FACE IRREPARABLE HARM IF THE TRO DOES NOT ISSUE.

Unless this Court grant's Plaintiff's Motion, he and all citizens of the Commonwealth will be irreparably harmed. Plaintiff has a constitutional *guarantee* to a republican form of government. Inherent in this guarantee is that laws that regulate the foundation of the Commonwealth will not be changed or altered outside of the bounds of the grants of authority made in the state Constitution. As a result of the Massachusetts Supreme Judicial Court's actions in exercising jurisdiction over the *Goodridge* case and then in radically re-defining state marriage laws, Plaintiff's guarantee has been violated. Prior to the Massachusetts Supreme Judicial Court's artificially imposed deadline of May 17, 2004, there has never been same-sex marriage in Massachusetts. Indeed, the court itself admitted that marriage in Massachusetts has always been the union of one man and one woman. As of the date of this Motion, no state in our Union has authorized the licensing of same-sex marriages. For over 200 years, marriage has only been between one man and one woman. On May 17, 2004, however, the landscape of marriage will be drastically altered for the entire country.

---

case is . . . the power of the Legislature to effect social change without interference from the courts, pursuant to art. 30 of the Declaration of Rights") (Spina J., dissenting).

The definition of marriage is of vital interest to society. Marriage, as it has existed for thousands of years, has provided the bedrock foundation to society. The United States Supreme Court has expressed the importance of marriage:

> [C]ertainly no legislation can be supposed more wholesome and necessary in the founding of a free, self-governing commonwealth . . . than that which seeks to establish it on the idea of the family, as consisting in and springing from the union for life of one man and one woman in the holy estate of matrimony; the sure foundation of all that is stable and noble in our civilization; the best guaranty of that reverent morality which is the source of all beneficent progress in social and political involvement.

*Murphy v. Ramsey*, 114 U.S. 15, 45 (1885).

Plaintiff has a constitutional guarantee that the definition of marriage will not be altered except by those expressly granted the authority to do so under the Massachusetts Constitution. Article 4, § 4 of the United States Constitution, which guarantees the right to all citizens of a republican form of government, is one of the most fundamental rights guaranteed by the Constitution. Alexander Hamilton explained that the healthy balance of power between the States and Federal government reduces the "risk of tyranny and abuse . . . ." *Gregory v. Ashcroft*, 501 U.S. 452, 459 (quoting The Federalist No. 28, pp. 180-81). In the First Amendment context, the Court has explained that even the denial of rights for a minimal period of time "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Wallace v. Jaffree*, 472 U.S. 38, 44 n.22 (1985); *New York Times Co. v. United States*, 403 U.S. 713 (1971). However, the loss of a republican form of government is even a more egregious loss that the loss of First Amendment rights.

In *Simon & Schuster*, the Court stated, "'The constitutional right of free expression is . . . intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us . . . in the belief that no other approach would comport with the premise of individual dignity and choice *upon which our political*

*system rests.*'" 502 U.S. 105, 116 (1991)(emphasis added) (*quoting Leathers v. Medlock*, 499 U.S. 439, 448-449 (1991)). If free speech rights are important because it is those rights "upon which our political system rests," then surely the political system itself is a valuable right that the abandonment of such system constitutes irreparable harm.

The specific facts of this case highlight the need for a temporary restraining order. On May 17, 2004, clerks throughout the state will begin issuing marriage licenses to same sex couples. It has been reported in the news that some of those clerks will openly disregard a state law that prevents issuance of a marriage license to nonresidents where the home state of those individuals would not permit the marriage. As demonstrated in the San Francisco situation, couples will no doubt flock to Massachusetts to obtain same-sex marriage licenses. Those couples will return to their home states seeking recognition of those licenses. In addition to pressing the issue of whether their home state will recognize an out of state same-sex marriage, there will be an additional issue of whether the license itself is valid since it was issued in violation of Massachusetts law. The widespread legal implications are not speculation – as reflected by the number of lawsuits around the country already challenging the marriage laws as unconstitutional.

The Vermont Supreme Court in *Baker v. State* explained another concern

> [W]hile the State's prediction of "destabilization" cannot be a ground for denying relief [on the merits], it is not altogether irrelevant. A sudden change in the marriage laws or the statutory benefits traditionally incidental to marriage may have disruptive and unforeseen consequences. Absent legislative guidelines defining the status and rights of same-sex couples, consistent with constitutional requirements, uncertainty and confusion could result.

*Baker v. State*, 744 A.2d 864, 887 (Vt. 1999).

Implementation of the *Goodridge* decision, which constitutes a violation of Plaintiff's federal constitutional guarantee of a republican form of government, will cause Plaintiff, like all citizens of the Commonwealth, to suffer irreparable harm. The temporary restraining order and preliminary injunction should issue.

18

## III.   BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF GRANTING THE TRO AND IS IN THE PUBLIC INTEREST.

Defendants will not be harmed by the granting of this injunction. Defendants have no right to enforce laws that were created in excess of their jurisdiction. The *Goodridge* decision was issued in direct violation of the separation of powers established by the people of Massachusetts in their constitution. Consequently, Defendants will not be harmed if this Court grants Plaintiff's relief.

On the other hand, if relief is not granted, marriage in Massachusetts and throughout the nation will be in a state of flux and uncertainty. Currently, the process is underway to amend the Massachusetts Constitution to define marriage as only between one man and one woman. If this is passed, then there will be great uncertainty as to the validity of the same-sex marriages that were issued due to the Supreme Judicial Court's unconstitutional actions in redefining "marriage.". In addition, it is highly likely that some same sex couples will move out of state, and attempt to enforce their marriages in other states under the Full Faith and Credit Clause of the United States Constitution. This nationwide marital mayhem would be the result of the Massachusetts Supreme Judicial Court violating the republican form of government, and radically changing the state's marriage laws. This Court should find that the balance of harm weighs in favor of granting Plaintiffs' request for a TRO and a Preliminary Injunction.

19

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that this Court temporarily

restrain and preliminarily enjoin enforcement of the *Goodridge* decision.

Respectfully Submitted,

*Chester Darling by RML*

Chester Darling
BBO# 114320
CITIZENS FOR THE PRESERVATION
OF CONSTITUTIONAL RIGHTS, INC.
306 Dartmouth Street
Boston, MA 02116
Telephone: (617) 536-1776
Telefacsimile: (978) 470-2219
Local Counsel for Plaintiff

Robert J. Muise*
 MI State Bar No. P62849
 NH State Bar No. 12953
THOMAS MORE LAW CENTER
3475 Plymouth Road, Suite 100
Ann Arbor, MI 48105-2550
Telephone: (734) 827-2001
Telefacsimile: (734) 998-4778
Attorney for Plaintiff
*Subject to admission *pro hac vice*

Stephen M. Crampton*
 MS State Bar No. 9952
Brian Fahling*
 WA State Bar No. 18894
AFA CENTER FOR LAW AND POLICY
100 Parkgate Drive
P.O. Drawer 2440
Tupelo, MS 38803
Telephone: (662) 680-3886
Telefacsimile: (662) 844-4234
Attorneys for Plaintiff
*Subject to admission *pro hac vice*

*Mathew D. Staver by RML*

Mathew D. Staver*
 Florida Bar No. 0701092
(Lead Trial Counsel)
Erik W. Stanley*
 Florida Bar No. 0183504
Anita L. Staver*
 Florida Bar No. 0611131
Joel L. Oster*
 Florida Bar No. 0659746
Rena M. Lindevaldsen*
 Florida Bar No. 0659045
LIBERTY COUNSEL
210 East Palmetto Avenue
Longwood, FL 32750
Telephone: (407) 875-2100
Telefacsimile: (407) 875-0770
Attorneys for Plaintiff
 *Subject to admission *pro hac vice*