IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT P. LARGESS, REP. MARK J. CARRON, REP. EMILE J. GOGUEN, REP. ROBERT S. HARGRAVES, REP. PETER J. LARKIN, REP. JAMES R. MICELI, REP. PHILIP TRAVIS, SEN. STEVEN C. PANAGIOTAKOS, REP. CHRISTOPHER P. ASSELIN, REP. EDWARD G. CONNOLLY, REP. JOHN A. LEPPER, REP. ELIZABETH A. POIRIER,<br><br>Plaintiffs,<br><br>vs.<br><br>SUPREME JUDICIAL COURT FOR THE STATE OF MASSACHUSETTS; CHIEF JUSTICE MARGARET MARSHALL, JUSTICE ROBERT J. CORDY, JUSTICE JUDITH A. COWIN, JUSTICE JOHN M. GREANEY, JUSTICE RODERICK L. IRELAND, JUSTICE MARTHA B. SOSMAN, JUSTICE FRANCIS X. SPINA, in their official capacities as Justices of the Supreme Judicial Court of Massachusetts; MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH; CHRISTINE C. FERGUSON, in her official capacity as Commissioner of the Massachusetts Department of Public Health; JUDY A. McCARTHY, in her official capacity as City Registrar for the City of Boston; CITY AND TOWN CLERKS 1-350,<br><br>Defendants. | Case No. 04-10921-JLT |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR DECLARATORY RELIEF, TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF.**

COMES NOW the Plaintiffs, by and through their undersigned counsel, pursuant to Fed. R. Civ. P. 65, and file this Memorandum of Law in support of their Renewed Motion for a Temporary Restraining Order and a Preliminary Injunction, and in support thereof, state as follows:

### STATEMENT OF FACTS AND INTRODUCTION

The facts are as stated in the amended complaint for Preliminary and Permanent Injunctive Relief, and Declaratory Relief. Plaintiffs rely upon those facts as if fully set forth herein.

Pursuant to the guarantee of a republican form of government (the "Republican Guarantee Clause") contained in the United States Constitution at Article IV, Section IV, plaintiffs Robert P. Largess, a citizen of the Commonwealth, and seven Massachusetts state legislators, respectfully move this Court to temporarily restrain, and preliminarily enjoin, enforcement of the decision of the Supreme Judicial Court in *Goodridge v. Dept. of Public Health*, 440 Mass. 309 (2003) insofar as the court in hearing the case and, separately, in expressly redefining "marriage", performed a function not granted to it by the citizens of the Commonwealth in the Massachusetts Constitution.

It bears emphasis that resolution of this case does *not* require this Court to determine the wisdom of the decision by the *Goodridge* court that denying marriage licenses to same-sex couples violated the state constitutional rights of those individuals. Nor does it ask this Court to vacate the Massachusetts decision. Rather, plaintiff asks this Court to enjoin enforcement of the *Goodridge* decision on the grounds that the court violated the separation of powers set forth in the state constitution on two separate and independent grounds, thereby depriving of the federal constitutional guarantee of a republic form of government.

### STANDARD FOR INJUNCTIVE RELIEF

The standards for issuance of a temporary restraining order and a preliminary injunction are the same. They require: "consideration of movant's likelihood of success on the merits, potential for irreparable harm, balancing of relevant equities, and effect on public interest." *Campbell Soup Co. v.*

1

*Giles*, 47 F.3d 467 (1st Cir. 1995). The First Circuit has stated, "Over time, we have crafted a four-part framework for use in determining whether the grant or denial of preliminary injunctive relief is appropriate. Under this formulation, trial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996).

## I. PLAINTIFFS HAVE A LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiffs can demonstrate a likelihood of success on the merits of his claim that the *Goodridge* court violated the separation of powers established in the Massachusetts constitution on two independent grounds. The SJC violated the separation of powers (i) in hearing the matter, and (ii) separately, in expressly redefining marriage. When one branch usurps the powers of another, co-equal branch, it constitutes a violation of the federal constitutional guarantee of a republican form of government. That guarantee inures to the individual citizens, like plaintiff Largess. It also inures to the individual legislators who have had their powers usurped by the SJC. *See Adams v. Clinton*, 90 F. Supp.2d 27 (D.D.C. 2000) (residents of DC had Art. III standing to maintain Guarantee Clause claim, finding that "deprivation of their right to republican form of local government" is a concrete injury).

### A. Federal Constitutional Guarantee of a Republican Form of Government

Article IV, section 4 of the U.S. Constitution provides that the "United States shall guarantee to every State in the Union a Republican Form of Government." Although claims premised on the Republican Guarantee Clause have long been viewed as nonjusticiable political questions in most circumstances, *see Luther v. Borden*, 48 U.S. (7 How.) 1, 46-47 (1849), Justice O'Connor noted in the 1992 decision in *New York v. United States* "that perhaps not all claims under the Guarantee Clause present nonjusticiable political questions." 505 U.S. 144, 183 (1992). *See also Reynolds v. Sims*, 377 U.S.

2

533 (1964) ("some questions raised under the Guaranty Clause are nonjusticiable, where 'political' in nature and where there is a clear absence of judicially manageable standards"). "Contemporary commentators," Justice O'Connor noted, "have likewise suggested that courts should address the merits of such claims, at least in some circumstances. *Id.* at 185 (citing L. Tribe, American Constitutional Law 398 (2d ed. 1988); J. Ely, Democracy and Distrust: A Theory of Judicial Review 118 and n. 122-123 (1980); W. Wiecek, The Guarantee Clause of the U.S. Constitution 287-289, 300 (1972); D. Merritt, 88 Colum. L. Rev. 1, 70-78 (Jan. 1988); Bonfield, The Guarantee Clause of Article IV, Section 4: A Study in Constitutional Desuetude, 46 Minn. L. Rev. 513, 560-65 (1962).

Immediately following the *New York* decision, several articles were published discussing the history and purpose of the Guarantee Clause. The 1849 Supreme Court decision in *Luther v. Borden,* 48 U.S. (7 How) 1 (1849), began decades worth of jurisprudence holding that Guarantee Clause cases are nonjusticiable. In substance, at issue in that case was the legitimacy of the Rhode Island government that arose out of the "Dor Rebellion" of 1861. Specifically, dissatisfied citizens elected a convention that subsequently drafted a new constitution, submitted it to the voters, and declared it adopted and ratified. A new legislature was elected under the unauthorized constitution. When the "old" charter government refused to recognize the validity of these proceedings, Thomas Dorr, the "rebel" governor, prepared to take control of the legislature by force. The charter government declared martial law to defend the attack. The parties went to court, asking the Supreme Court to determine which government was the legal government. The Court declined to reach the question, holding that the power to determine the legitimacy of a state government had been given to Congress and to the President. The Court's holding that the claim was nonjusticiable political question set the tone for the future Guarantee Clause claims.

Even after *Luther*, however, the Court did not summarily dismiss Guarantee Clause claims. In *Minor v. Happersett*, 88 U.S. (21 Wall.) 162 (1874), the Court noted that state governments in place when the Constitution was adopted were "presumed" to be consistent with the Guarantee Clause and that these

3

existing governments provided "unmistakable evidence of what was republican in form." *Id.* at 176. The Court concluded that the disenfranchisement of women did not violate the Guarantee Clause. In *In re Duncan*, 139 U.S. 449 (1891), the Supreme Court again considered the merits of the Guarantee Clause claim, rather than summarily dismissing it as a nonjusticiable political question.

In 1912, the Supreme Court returned to the reasoning of *Luther* and concluded that Guarantee Clause questions are inherently political in nature and nonjusticiable. *Pacific States Telephone & Telegraph Co. v. Oregon*, 233 U.S. 118 (1912). The sweeping commitment of Guarantee Clause claims to the political branches was somewhat curtailed in *Baker v. Carr*, 369 U.S. 186 (1962), where the Court provided guidelines to determine whether a case involved a political question: (i) whether the case involved a question textually committed to a coordinate political department; (ii) whether there is a lack of judicially discoverable and manageable standards for resolving it; (iii) whether it is impossible to decide the matter without an initial policy determination of a kind clearly for nonjudicial discretion; (iv) whether the court's decision of the matter would demonstrate a lack of respect for coordinate branches of government; (v) whether there is an unusual need for unquestioning adherence to a political decision already made; or (vi) whether there is potential for embarrassment of multifarious pronouncements by various departments on one question. *Id.* at 217. Two years later, in *Reynolds v. Sims*, 377 U.S. 533 (1964) the Supreme Court pointed to its decision in Baker, noting that "*some* questions raised under the Guaranty Clause are nonjusticiable . . . ." *Id.* at 582.

Finally, in 1992, the Supreme Court in *New York* stated that not all Guarantee Clause claims are nonjusticiable. In the wake of the Supreme Court cases law, it is clear that there are circumstances in which the Republican Guarantee Clause can, and should, be a basis for reigning in one branch of government. *See generally*, Ewrin Chemerinsky, *Cases Under the Guarantee Clause Should be Justiciable*, 65 U. Colo. L. Rev. 849 (1994); Debra F. Salz, *Discrimination-Prone Initiatives and the Guarantee Clause: A Role for the Supreme Court*, 62 Geo. Wash. L. Rev. 100 (1993); see also Jonathon

4

K. Waldrop, Journal of Law & Politics Spring, 1999 NOTE: *Rousing the Sleeping Giant? Federalism and The Guarantee Clause*, 15 J.L. & Pol. 267.

At its core, the Republican Guarantee Clause is a "protector of basic individual rights and should not be treated as being solely about the structure of government." Chemerinsky, 65 U. Colo. L. Rev. at 851. "[T]he Guarantee Clause should be regarded as assuring basic political rights, and therefore it is very much the judicial role to interpret and apply this constitutional provision." *Id.* at 852. In fact, to simply categorize Guarantee Clause issues as political, and nonjusticiable, leads to the "only instance in which nonjusticiability has the effect of rendering a constitutional provision a nullity." *Id.* at 851.

Professor Chemerinsky clarifies which cases should be considered political questions, and which should not. "Matters should be deemed to be a political question only if there is reason to believe that the judicial is ill-suited to enforce a particular constitutional provision . . . ." 65 U. Colo. L. Rev. at 853. "[T]he Supreme Court almost always has used the political question doctrine in areas that pertain to the structure of government and not individual rights." Here, where the individual rights of the citizens of the Commonwealth to have the separation of powers created by them in the Constitutional have been violated, the case falls squarely within the court's power to "defin[e]and safeguard[] fundamental rights – "rights that are truly at the heart of the republican government." *Id.* at 869.

A 1973 Kansas Supreme Court case further highlights that this is one of those rare cases where one branch of the state government has exceeded its powers, thereby violating the federal guarantee of a republican form of government. In *Vansickle v. Shanahan*, 212 Kan. 426, 511 P.2d 223 (Kan. 1973), the Supreme Court of Kansas thoroughly discussed the history and purpose of the separation of powers and Guarantee Clause, concluding even before the U.S. Supreme Court's 1992 decision in *New York*, that not all Guarantee Clause claims are nonjusiticiable. 511 P.2d at 233 ("modern analysis of the guaranty clause leads to the conclusion that neither Luther nor Pacific are authority for the proposition that all questions arising under the guaranty clause are nonjusticiable"). Significantly, the court pointed out that

5

> the legislative power is the power to make, amend, or repeal laws; the executive power is the power to enforce the laws, and the judicial power is the power to interpret and apply the laws in actual controversies. As Chief Justice John Marshall said in *Wayman v. Southard*, 23 U.S. 1, 46 . . . The difference between the departments undoubtedly is, that the legislature makes, the executive executes and the judiciary construes the law.

511 P.2d at 235. In other words, the courts generally have the authority to construe the law, but it is the legislature that makes new laws. Here, even assuming the court had the authority to exercise jurisdiction over the *Goodridge* case (which it did not), it exceeded the separation of powers in making new law – it expressly redefined and "reformulated" marriage to be the "voluntary union of two persons as spouses." The SJC's actions squarely implicate the fundamental rights sought to be protected by the Guarantee Clause.

> Again, there is no liberty, if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then the legislator. . . . *Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator.*

511 P.2d at 239 (emphasis added).

This case presents one of the instances in which a Republican Guarantee Clause claim must be viable. The essence of the republican guarantee is the right of a State's citizens to "structure their government as they see fit." *Kelley v. United States*, 69 F.3d 1503, 1511 (10th Cir. 1995). *See also New York*, 505 U.S. at 181 ("The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'"). In *Gregory v. Ashcroft*, the Supreme Court explained the history and purpose of the separation of powers.

> Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the

6

risk of tyranny and abuse from either front. Alexander Hamilton explained to the people of New York, perhaps optimistically, that the new federalist system would suppress completely "the attempts of the government to establish a tyranny. . . . In a confederacy the people, without exaggeration, may be said to be entirely the masters of their own fate. Power being almost always the rival of power, the general government will at all times stand ready to check the usurpations of the state governments, and these will have the same disposition towards the general government. The people, by throwing themselves into either scale, will infallibly make it preponderate. *If their rights are invaded by either, they can make use of the other as the instrument of redress.*"

501 U.S. 452, 459 (1991) (quoting The Federalist No. 28, pp. 180-181 (C. Rossiter ed. 1961)) (emphasis added).

The *Gregory* Court further discussed the issue by quoting James Madison

"In a single republic, all the power surrendered by the people is submitted to the administration of a single government; and the usurpations are guarded against by a division of the government into distinct and separate departments. In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among district and separate departments. *Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself.*"

*Id.* (quoting The Federalist No. 51, p.323) (emphasis added). In *New York*, the Supreme Court dismissed the Republican Guarantee Clause claim only because the statute in that case did not "pose any realistic risk of altering the form or the method of functioning of New York's government." 505 U.S. at 186. That Court, however, went on to explain:

Some truths are so basic that, like the air around us, they are easily overlooked. Much of the Constitution is concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form. The result may appear "*formalistic*" in a given case to partisans of the measure at issue, because such measures are typically the product of the era's perceived necessity. But the Constitution protects us from our own best intentions: *It divides power among sovereigns and among braches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.*

505 U.S. at 187.

The *Goodridge* court altered the allocation of power expressly provided for in the Massachusetts constitution between the judiciary and Legislature. *See, e.g., Brzonkala v. Virginia Polytechnic Institute*

7

*and State Univ.*, 169 F.3d 820, 895 (4th Cir. 1999) (noting that the federal courts are supposed to protect the structural preferences of a State's citizens, serving as a sort of "structural referee"), *aff'd sub nom United States v. Morrison*, 529 U.S. 598 (2000). A review of the powers granted in the Massachusetts Constitution reveals that the *Goodridge* court violated the express separation of powers in at least two ways: it lacked subject matter jurisdiction to even hear the case, and, *wholly separate*, it was without power to perform the legislative function of redefining marriage. There can be no question that the court's cavalier attitude toward adhering to the express separation of powers as provided by the people of the Commonwealth in their constitution, is the antithesis of a guarantee of a republican form of government.

**B.  The Division of Powers in the Massachusetts Constitution.**

The Massachusetts Constitution establishes three co-equal and independent branches of government. The legislative power is reposed in the General Court, *Mass. Const.* Part 2, ch. I, § I, arts. I, IV; the supreme executive power is reposed in the Governor, *Mass. Const.* Part 2, ch. II, § 1; and the judicial power is reposed in the judiciary, *Mass. Const.* Part. 2, ch. III. Under the Massachusetts Constitution, no branch of government shall exercise the powers of either of the other two branches. *Mass. Const.* Part 1, art. XXX. This separation of powers is essential for preserving the rule of law and preventing tyranny- -whether from the executive, legislative, or judicial branch. *See* THE FEDERALIST NO. 47 (James Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.").

The state constitution seeks to ensure this separation of powers in providing that the "judicial shall never exercise the legislative and executive powers." *Mass. Const.* Part 1, art. XXX. Under this principle, each branch of government performs its constitutionally-established functions within its own limited jurisdiction. Part I, Art. XVIII of the constitution provides that "The people . . . have a right to require of their lawgivers and magistrates, an exact and constant observance of them, in the formation and

8

execution of the laws necessary for the good administration of the Commonwealth." As the Supreme Judicial Court has acknowledged, this limitation also applies to the courts. *See Opinion of the Justices to the Senate*, 383 Mass. 895, 916 (1981) ("[B]oundaries set by the Constitution on our duty to furnish opinions are jurisdictional in nature and 'must be strictly observed in order to preserve the fundamental principle of the separation of the judicial from the executive and the legislative branches of government.'") (quoting *Answer of the Justices to the Council*, 362 Mass. 914, 917 (1973)).

Moreover, the Supreme Judicial Court has made clear that no branch of government (and most especially the Legislature) may abandon or transfer any of the powers entrusted to it by the Constitution to any other person or group of persons. *See Opinion of the Justices to the House of Representatives*, 328 Mass. 674, 675 (Mass. 1952) ("Article 30 of the Declaration of Rights provides for the permanent separation of the executive, legislative, and judicial powers in the government of the Commonwealth, and the Constitution, by the various provisions of c. 1, § 1, particularly those contained in art. 4, designates the General Court as the repository of the legislative power. *It is fundamental that no one of the three great departments of government can abandon any of the powers entrusted to it by the Constitution or transfer those powers to any other person or group of persons. If this could be done the plan of government laid down by the Constitution could be destroyed.*") (emphasis added). *See also Town of Brookline v. The Governor*, 407 Mass. 377, 384 n.10 (1990) ("We would be reluctant to tolerate a situation in which allegedly unconstitutional conduct would be free from judicial scrutiny even on the request of an entity most directly affected by the alleged unlawful conduct."); *cf. LaGrant v. Boston Housing Authority*, 403 Mass. 328, 330 (1988) (concluding that a branch of government has standing in a "claim that [another branch] has violated art. 30 by encroaching on [its] power" for if it "cannot seek judicial relief, then the . . . branch might be foreclosed from protecting its separate powers").

As discussed below (I.B.2.), simply by hearing the case, the judiciary usurped the legislative power over all "causes" of marriage. It bears emphasis that, separate and apart from that first argument,

9

the judiciary usurped the legislative power when it redefined marriage as its solution for what it found to be discriminatory marriage laws. Thus, without even delving into the intricacies of the separation of powers concerning who can hear "causes" of marriage, this Court can enjoin enforcement of the decision because the *Goodridge* court exceeded its powers in redefining marriage, thereby violating the Republic Guarantee Clause.

### 1. The Goodridge court performed a purely legislative function when it redefined marriage to include same-sex marriage.

The treatment afforded the Goodridge Court of the separation of powers argument stands in stark contrast to the Republican Guarantee Clause. One fact quite telling of the court's disregard for the fundamental importance of the separation of powers is the fact that the argument was specifically put forth before the court, yet it failed to treat it as a serious restraint on its powers. In particular, the court simply states that "[t]o label the court's role as usurping that of the Legislature is to misunderstand the nature and purpose of judicial review." It offered no explanation of where it obtained the power to fashion a new law and decree its implementation within 180 days.

Assuming *arguendo* that the court had subject matter jurisdiction to even consider the constitutionality of the State's refusal to issue marriage licenses to same sex couples, it did not have the power to redefine the marriage laws. Yet, that is precisely what the court did. The court explains that the "everyday meaning of 'marriage' is 'the legal union of a man and woman as husband and wife,' . . . and the plaintiffs do not argue that the term 'marriage' has ever had a different meaning under the Massachusetts law.'" The court also explained that the Massachusetts statutes "confirms" the Legislature's intent to adopt and adhere to that definition of marriage. Indeed, the court concluded that the licensing statute could *not* be "construed to permit same-sex couples to marry." After concluding that denying marriage to same-sex couples violates their constitutional rights under the Massachusetts constitution, the court turned to fashioning a remedy. Surprisingly, it turned to the laws of a foreign

10

country for guidance. It referred to the actions of the Court of Appeal for Ontario, which not only declared the marriage laws unconstitutional, but then "refined the common-law meaning of marriage" to permit same-sex marriage. Thus, it is no surprise that the *Goodridge* court held: "We construe civil marriage to mean the voluntary union of two persons as spouses, to the exclusion of all others. This reformulation redresses the plaintiffs' constitutional injury . . . ." What the court should have done is turn to U.S. precedence for guidance, including the decision of the Supreme Court in Vermont. The Supreme Court of Vermont, in *Baker v. State*, faced the exact same question of how to fashion a remedy after it declared that refusal to grant marital benefits to same-sex couples was a violation of plaintiffs' state constitutional rights. There, the court stated:

> We hold only that plaintiffs are entitled under Chapter I, Article 7, of the Vermont Constitution to obtain the same benefits and protections afforded by Vermont law to married opposite-sex couples. *We do not purport to infringe upon the prerogatives of the Legislature to craft an appropriate means of addressing this constitutional mandate*, other than to note that the record here refers to a number of potentially constitutional statutory schemes from other jurisdictions.
> * * *
> [I]t cannot be doubted that judicial authority is not ultimate authority. It is certainly not the only repository of wisdom. When a democracy is in moral flux, courts may not have the best or the final answers. Judicial answers may be wrong. They may be counterproductive even if they are right. Courts do best by proceeding in a way that is catalytic rather than preclusive, and that is closely attuned to the fact that courts are participants in the system of democratic deliberation.

744 A.2d 864, 886-88 (Vt. 1999) (emphasis added).[1]

Similarly, in *Colegrove v. Green*, the United States Supreme Court considered the constitutionality of how Illinois districts were drawn. 328 U.S. 549 (1946). The Court pointed out that "[o]f course no court can affirmatively remap the Illinois districts so as to bring them more in conformity with the standards of fairness for a representative system. At best we could only declare the existing system

---

[1] Even in the landmark decision by the Supreme Court in *Brown v. Board of Education*, 347 U.S. 483 (1954), the Court did *not* fashion a remedy for desegregating schools. *See Brown v. Board of Education*, 349 U.S. 294 (1955).

11